UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **MARK DAVID HOOK** **(A088-927-046)** | : | **NUMBER 11-CV-00131-P** |
| VS. | : | JUDGE MINALDI |
| ERIC HOLDER, JR., *ET AL.* | : | MAGISTRATE JUDGE KAY |

### REPORT AND RECOMMENDATION

Before the court is an application for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2241 filed by the *pro se* petitioner known as "Mark David Hook" (hereafter, "petitioner"). Doc. 1. Petitioner is an immigration detainee in the custody of the Department of Homeland Security/United States Immigration and Customs Enforcement (hereafter, "ICE"). He is currently housed at the South Louisiana Detention Center in Basile, Louisiana. Doc. 77.

Petitioner has been in ICE custody since April 2, 2008. He argues that his continued detention is unlawful under *Zadvydas v. Davis*, 533 U.S. 678 (2001), because he has been detained for longer than six months and there is no significant likelihood of his removal in the reasonably foreseeable future. The government, as respondent herein, argues that petitioner is hampering removal efforts by claiming a false identity and nationality. Therefore, the government argues, petitioner's extended detention is warranted and will remain so until he reveals his true identity and citizenship.

A two-day evidentiary hearing was held in this matter, which concluded on August 15, 2013. Doc. 56. At the conclusion of the hearing, the undersigned took the matter under advisement and ordered the parties to prepare post-hearing briefs. Doc. 56, p. 96. Having

considered the briefs and the evidence, the court is ready to issue its report and recommendation.

For the reasons that follow, IT IS RECOMMENDED that the application be DISMISSED WITHOUT PREJUDICE.

## I. FACTS & PROCEDURAL HISTORY

This is petitioner's second *habeas* application in the Western District of Louisiana. The first application was filed in 2009 in the Monroe Division and was assigned to District Judge Robert James and Magistrate Judge Karen Hayes. *See Hook v. Holder*, 3:09-cv-00423 (W.D. La. 2009). Because petitioner's first application was identical to this one, we have taken judicial notice of the findings and records of the prior related proceeding. Doc. 55, p. 6; *see also* Fed. R. Evid. 201; *Matter of Missionary Baptist Church Foundation of Am., Inc.*, 712 F.2d 206, 211 (internal citations omitted) ("A court may take judicial notice of the record in prior related proceedings, and draw reasonable inferences therefrom.").

### A. Background

The convoluted early history of ICE's efforts to deport petitioner was comprehensively set forth in the previous case, [*Hook v. Holder*, 3:09-cv-00423 (W.D. La. 2009), doc. 18] and need not be repeated here in full. Nevertheless, a general summary of the facts is necessary in order to contextualize the application before this court.

Petitioner claims that he is named "Mark David Hook." Doc. 55, p. 10. He claims that he was born on March 13, 1970, and was born and raised in London, England. *Id.* Petitioner testified that he left the United Kingdom in approximately 2002. *Id.* at 11–12.

Petitioner has been in ICE custody since April 2, 2008. *See* doc. 55, p. 12; doc. 45, ex. G-1. On that date, a Border Patrol Agent encountered petitioner during a transportation check at the Greyhound Bus Station in Baton Rouge, Louisiana. *See* doc. 45, ex. G-1. Petitioner told the

agent that his name was "Mark David Hook" and that he was a citizen of the United Kingdom. *Id.* He claimed that he had entered the United States two weeks earlier under the Visa Waiver Program,[1] and that he had accidentally left his passport in New York City. *Id.* An investigation revealed that petitioner actually entered the United States at San Juan, Puerto Rico, in June 2004 via American Airlines Flight 01130 from Antigua. *Id.* When presented with this information, petitioner admitted that it was true. *Id.* He also stated that he had been living in New York City since he arrived in 2004. *Id.*

Because petitioner failed to depart as required under the Visa Waiver Program, the Border patrol agent placed petitioner under ICE custody to await removal from the United States. *Id.* ICE issued a final order of removal on April 2, 2008, the same day as the arrest. *See* doc. 45, exs. G-2, G-3, G-4. Once he was in ICE custody petitioner applied for a new passport from the United Kingdom Passport Service with the assistance of his deportation officer. *See* doc. 55, pp. 13–15; doc. 45, ex. G-5. The application listed the lost passport number as 029518553. *See* doc. 45, ex. G-5.

To date, ICE has been unsuccessful in deporting petitioner for a simple reason—the British do not believe that the "Mark David Hook" in ICE custody is who he claims to be. By letter dated June 20, 2008, the British Consulate informed petitioner that a passport bearing the number he provided had already been reported lost by another individual. *See* doc. 45, ex G-17. The letter stated that, because this person had provided sufficient proof of his identity, the passport was replaced. *Id*. Therefore, the Consulate informed petitioner that it would need more convincing proof of his identity in order to provide him consular assistance. *Id.*

---

[1] "The [Visa Waiver Program] permits eligible nationals from certain designated countries to apply for admission to the United States for ninety days or less as non-immigrant visitors without first obtaining a visa." *McCarthy v. Mukasey*, 555 F.3d 450, 459–60 (5th Cir. 2009) (citing 8 U.S.C. § 1187). "However, the statute imposes upon every participating alien a reciprocal waiver requirement. Participating aliens must waive 'any right . . . to contest, other than on the basis of an application for asylum, any action for removal . . . .'"[4] *Id.* (citing 8 U.S.C. § 1187(b)(2).

Over the next few months ICE and the British Consulate repeatedly requested information from petitioner in order to establish his identity. *Hook v. Holder*, 3:09-cv-00423 (W.D. La. 2009), doc. 18, pp. 8–9. The only identification that he could provide was a purported United Kingdom driver's license which he was carrying with him at the time of his arrest. *Id.* at 7. He claimed that he could not obtain his passport or other documents because all of his identification (and the means of accessing it) was in his luggage that had been seized by the Border Patrol. Doc. 55, pp. 19–22. Further complicating removal efforts, petitioner repeatedly refused to answer questions about himself or claimed he could not remember details due to "medical reasons." *Hook v. Holder*, 3:09-cv-00423 (W.D. La. 2009), doc. 18, pp. 5–6. ICE eventually requested the assistance of INTERPOL in order to determine petitioner's identity and nationality but INTERPOL was unable to do so. *Id.* at 8, n. 10; *see also* doc. 45, ex. G-24.

The British Consulate withdrew petitioner's passport application on August 15, 2008, due to his inability to prove his identity. *Hook v. Holder*, 3:09-cv-00423, doc. 18, p. 9. On September 9, 2008, ICE informed petitioner that his detention was being extended due to his failure to make timely and good faith efforts to obtain travel or other documents necessary for his removal. *Id*.

B. **First** *Habeas* **Application**

On March 18, 2009, petitioner filed his first *habeas* application, arguing that his indefinite detention was unconstitutional under *Zadvydas v. Davis*, 533 U.S. 678 (2001). On June 19, 2009, Magistrate Judge Hayes recommended dismissal of the application, finding *Zadvydas* to be inapplicable because petitioner was hampering ICE's removal efforts. *See Hook v. Holder*, 3:09-cv-00423 (W.D. La. 2009), doc. 18. Her Report and Recommendation specifically found that petitioner provided evasive, incomplete, and misleading information to

the British Consulate and ICE. *Id.*

Magistrate Judge Hayes afforded much weight to the British Government's determination that petitioner was not the person issued the passport number listed in his application. *Id.* at 15. She also noted that petitioner's decidedly non-English accent made it difficult to believe that he was a lifelong resident of London.[2] *Id.* at 14. Furthermore, Judge Hayes discussed petitioner's failure to cooperate with removal efforts, particularly: (1) his repeated failure to provide any addresses of his immediate family more specific than "London;" (2) his puzzling refusal to answer questions about himself; and (3) the fact that none of the documents provided by petitioner provided evidence of his citizenship. *Id.* at 15–18. Finally, she did not accept petitioner's claim that his documents and access thereto were located in the luggage seized by the Border Patrol. *Id.* at 16. Accordingly, Judge Hayes recommended dismissal of the *habeas* application on the grounds that the statutory removal period should be tolled due to petitioner's failure to cooperate. *Id.* at 18.

On July 17, 2009, Judge James adopted the report and recommendation, and dismissed the matter without prejudice. *Hook v. Holder* 3:09-cv-00423 (W.D. La. 2009), doc. 19. Petitioner later filed a motion to reopen the proceeding. *Hook v. Holder* 3:09-cv-00423 (W.D. La. 2009), doc. 20. Judge James denied the motion to reopen, stating that "[w]hile it is regrettable that Hook remains detained in a federal facility, his detention is a result of his own failure to cooperate with [ICE] and to provide information about his identity." *Hook v. Holder* 3:09-cv-00423 (W.D. La. 2009), doc. 23.

## C. Current *Habeas* Application

Petitioner filed the instant *habeas* application on January 20, 2011. Doc. 1. He

---

[2] We particularly concur in this conclusion of Judge Hayes. A transcript of the proceeding before this court will be replete with instances of the undersigned asking the plaintiff to repeat himself and to speak more slowly so that he could be understood by the court and the court reporter.

essentially advances the same argument as before, namely that his continued detention is unlawful under *Zadvydas v. Davis* and 8 U.S.C. § 1231(a)(6). Petitioner offers no new proof of his identity. His argument is solely premised on the purported misconduct of ICE and the British Consulate. Petitioner argues that he has fully cooperated with his removal because he has diligently completed requests for travel documents and provided ICE and the British Consulate with documentation establishing his United Kingdom citizenship. Doc. 1, att. 2, p. 4 at ¶ 13.

On February 22, 2012, a federal grand jury sitting in the Monroe Division of the Western District of Louisiana indicted petitioner for hampering of removal efforts in violation of 8 U.S.C. § 1253 (a)(1)(C). *USA v. Hook*, 3:12-cr-52 (W.D. La. 2012). The current *habeas* application was stayed during the pendency of the criminal matter. Doc. 31. The government later moved to dismiss the indictment due to concerns that the prosecution would be unable to offer certain items into evidence. Specifically, the government was concerned with authenticating several documents prepared in the United Kingdom due to a lack a proper attestation as to a foreign document's authenticity under Federal Rule of Evidence 902(12). *USA v. Hook*, 3:12-cr-52 (W.D. La. 2012), docs. 58, 60. These documents were meant to establish that the U.K. citizen who had previously claimed petitioner's passport lost was also named Mark David Hook, and also had the same date of birth as the petitioner herein. *USA v. Hook*, 3:12-cr-52 (W.D. La. 2012), doc. 58, att. 1, p. 2. On November 30, 2012, Judge Tom Stagg granted the government's motion over petitioner's objection, and dismissed the indictment without prejudice. *USA v. Hook*, 3:12-cr-52 (W.D. La. 2012), doc. 62.

After the criminal case was dismissed, the *habeas* proceedings in this court resumed. Doc. 34. This court held a two-day evidentiary hearing on this matter, which began on April 25, 2013 and resumed on August 15, 2013. Docs. 55–56. The government admitted 70 exhibits into

evidence, and petitioner one.  Docs. 45, 53.  At the conclusion of the hearing, the court took the matter under advisement and ordered the parties to prepare post-hearing briefs.  Doc. 56, p. 96.

## II. LAW

Petitioner seeks *habeas corpus* relief pursuant to 28 U.S.C. § 2241, which provides in pertinent part: "The writ of *habeas corpus* shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States . . . ." 28 U.S.C. § 2241(c)(3). The question in this case therefore turns upon whether petitioner's continued detention is in violation of federal law.

Following an order of removal, the Attorney General is given 90 days to effect the removal of the alien. 8 U.S.C. § 1231(a)(1)(A).  The removal period begins on the latest of: (1) the date the removal order becomes administratively final; (2) the date of a court's final order if the removal order is judicially reviewed and the court orders a stay of the removal of the alien; or (3) the date the alien is released from detention or confinement (except under an immigration process).  8 U.S.C. § 1231(a)(1)(B).  Detention beyond the removal period is authorized when "the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal." 8 U.S .C. § 1231(a)(1)(C).

In *Zadvydas v. Davis*, 533 U.S. 678 (2001)), the Supreme Court held that in order for post-removal detention under 8 U.S.C. § 1231 to be constitutional, it must be limited "to a period reasonably necessary to bring about that alien's removal from the United States." *Zadvydas*, 533 U.S. at 689. The Court went on to recognize six months as a presumptively reasonable period of detention following a final order of removal:

> After this 6–month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future,

> the Government must respond with evidence sufficient to rebut this showing. And for the detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink. This 6–month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.

*Zadvydas*, 533 U.S. at 701.

Thus, merely meeting the six-month detention period does not require automatic release, but rather at that point there must be a determination of whether there is a significant likelihood of petitioner's removal in the reasonably foreseeable future. *Andrade v. Gonzales*, 459 F.3d 538, 543 (5th Cir. 2006) (citing *Zadvydas*, 533 U.S. at 701). Further, "the alien bears the initial burden of proof in showing that no such likelihood of removal exists." *Id.* In order to show that his removal is not likely to happen in the reasonable foreseeable future, petitioner must show that he has made a "full and honest effort to secure travel documents." *Davis v. Gonzalez*, 482 F. Supp. 2d 796, 802 (W.D. Tex. 2006) (citing *Lema v. INS*, 341 F.3d 853, 857 (9th Cir. 2003)).

"[T]he risk of indefinite detention that motivated the Supreme Court's statutory interpretation in *Zadvydas* does not exist when an alien is the cause of his own detention." *Pelich v. INS*, 329 F.3d 1057, 1060 (9th Cir. 2003); *see also Ayigba v. Young*, 2007 WL 2736678 at *5 (W.D. La. 2007); *Rosario v. Gonzalez*, 2007 WL 1232207 at *5 (W.D. La. 2007); *Amadi v. Young*, 2007 WL 855358 at *3 (W.D. La. 2007). In other words, when an alien detainee is the cause of his own detention, he cannot assert a viable constitutional challenge to his indefinite detention because "the detainee controls the clock." *Lema*, 341 F.3d at 856 (citing *Pelich*, 329 F.3d at 1260). Under such circumstances, the "detainee cannot convincingly argue that there is no significant likelihood of removal in the reasonably foreseeable future . . . ." *Id*.

### III. DISCUSSION

It is clear from the record that petitioner's failure to cooperate is the cause of his

prolonged detention. Based upon the evidence and testimony presented, it is extremely difficult to accept that petitioner is truly a citizen of the United Kingdom named "Mark David Hook." The undersigned agrees with Magistrate Judge Hayes's determination that the information petitioner provided as proof of his identity is far too vague to justify a belief that petitioner is a British citizen by that name. *Hook v. Holder*, 3:09-cv-00423 (W.D. La. 2009), doc. 18. Petitioner has not refuted that determination in the instant case, and his continued detention is therefore warranted.

### A. Evidence of the "Other" Mark David Hook

In his brief, petitioner argues the there is no evidence to substantiate the "suspicions" of ICE and the British Consulate that petitioner is hiding his true identity. *Id.* at 16; 25–26. The undersigned disagrees, based primarily on Exhibits G-22 and G-59. *See* docs. 45, 53. Exhibit G-22 is a copy of a report prepared by Mr. Danesh Chand, an Executive Officer at the British Identity and Passport Service, (hereafter, the "IPS Report") regarding to the lost passport application of a man named Mark David Hook currently living in Great Britain. *See* doc. 53, ex. 22. Exhibit G-59 is a copy of official British documents (hereafter, "the Hook Identification Documents"), which establish Mr. Hook's identity. *See* doc. 45, ex. G-59. The evidence contained in these documents, along with petitioner's objections to their admissibility, will be discussed below.

#### 1. Petitioner's Admissibility Objections

Petitioner argues that the above documents are inadmissible because they are not properly authenticated under the Federal Rules of Evidence. Doc. 57, pp. 28–33. This argument lacks merit.

At the evidentiary hearing held on April 25, 2013, the Hook Identification documents

were admitted into evidence, without objection by petitioner's former counsel. Doc. 43; *see also* doc. 55, p. 7. However, petitioner's counsel did object to the introduction of the IPS Report. Doc. 55, pp. 59–63; *see also* doc. 53, Ex. G-22. The government had previously attempted to admit the IPS report into evidence in the criminal matter, but was unable to do so because of the lack a proper attestation as to a foreign document's authenticity pursuant to Federal Rule of Evidence 902(12). Doc. 55, pp. 59–65. After considering counsel's objection, the undersigned continued the hearing to give the parties a reasonable opportunity to inquire into the document's authenticity. *Id.* at 82–84; *see also* doc. 56, p. 8.

When the hearing resumed on August 15, 2013, petitioner first moved to withdraw his attorney and proceed *pro se*.[3] After his counsel withdrew, the government sought to introduce the IPS report into evidence but petitioner again objected. Doc. 56, p. 20. Petitioner argued that under the "collateral estoppel" doctrine, the document should be ruled inadmissible because it had already been ruled inadmissible in the criminal case. *Id.* at 20–32. The undersigned overruled that objection because: (1) Judge Stagg never ruled on the admissibility issue in the criminal case; and (2) even if he had, his ruling would not prevent the IPS report from coming into evidence here insofar as the collateral estoppel doctrine does not apply to evidentiary issues. *Id.* Petitioner also raised an objection based on improper authentication of a foreign public document under Federal Rule of Evidence 902(3).[4] *Id.* at 32–41. The undersigned overruled

---

[3] The undersigned advised petitioner that he would waive the attorney-client privilege if he filed the motion into the record or offered any testimony regarding his attorney's conduct. Doc. 56, pp. 3–17. Petitioner advised the court that he understood. *Id.*

[4] Federal Rule of Evidence 902(3) reads as follows:

> **(3) Foreign Public Documents**. A document that purports to be signed or attested by a person who is authorized by a foreign country's law to do so. The document must be accompanied by a final certification that certifies the genuineness of the signature and official position of the signer or attester--or of any foreign official whose certificate of genuineness relates to the signature or attestation or is in a chain of certificates of genuineness relating to the signature or attestation. The certification may be made by a secretary of a United States embassy or legation; by a consul general, vice consul, or

that objection as well, noting that even though the IPS report was missing the "final certification" as to the genuineness of the foreign official's signature, petitioner and his former counsel had been given ample opportunity in which to investigate the document's authenticity and accuracy. *Id.* at 41–43.  Therefore, the undersigned ordered that IPS Report be treated as presumptively authentic, as authorized by the rule. *Id.*; *see also* Fed. R. Evid. 902(3)(A).

Thus, to the extent that the undersigned has already ruled on the matter, petitioner's argument that these documents are inadmissible is without merit.  Petitioner was given ample opportunity to inquire into the documents' authenticity and his only objection was based on the lack of a final certification.  He did not (and could not) argue that the information contained in the document was false or inaccurate.  Under Fed. R. Evid. 902(3), the court is within its discretion to rule that a foreign official document is presumptively authentic.

**2. The IPS Report**

The IPS Report confirms that a U.K. citizen named Mark David Hook was issued passport bearing number 029518553 on November 28, 1997.  *See* doc. 53, ex. G-22.  On August 8, 2000, Mr. Hook reported that the passport had been "lost in the post from DVLA."[5]  *Id.*  He filled out an application form, and attached a short-form birth certificate and two photographs as supporting documents.  *Id.*  The IPS accepted his identity and issued him a replacement passport on December 2, 2000.  *Id.*

---

consular agent of the United States; or by a diplomatic or consular official of the foreign country assigned or accredited to the United States. If all parties have been given a reasonable opportunity to investigate the document's authenticity and accuracy, the court may, for good cause, either:

    **(A)** order that it be treated as presumptively authentic without final certification; or
    **(B)** allow it to be evidenced by an attested summary with or without final certification.

Fed. R. Evid. 902(3).
[5] The DVLA is the British "Driver & Vehicle Licensing Agency;" the equivalent of the State-run Departments of Motor Vehicles in the United States. *See* https://www.gov.uk/government/organisations/driver-and-vehicle-licensing-agency

The IPS report contains two enlarged color photographs of Mr. Hook, which establish that Mr. Hook and petitioner are two completely different people. The IPS report also establishes that Mr. Hook was issued passport number 029518553 in 1997, and reported it lost in 2000. This was the same number on the passport that petitioner used to enter the country in 2004, [*see* doc. 45, ex. G-66] and which was listed on petitioner's lost passport application in 2008, [*see* doc. 45, ex. G-5]. The undersigned cannot ignore the fact that petitioner entered the United States with a passport previously reported lost by someone else, who also happens to share petitioner's full name, date of birth, and citizenship. The British Consulate and ICE did not consider this a coincidence and neither does the undersigned.

### 3. The Hook Identification Documents

The Hook identification documents further establish the identity of the Mark David Hook currently residing in the United Kingdom. *See* doc. 45, ex. G-59. The birth certificate reflects when, where, and to whom Mr. Hook was born. *Id.* Next, there is a copy of a questionnaire that Mr. Hook completed at the behest of the North Yorkshire Police. *See* doc. 45, ex. G-59. This document provides the following pertinent information:

(1) Mr. Hook's current and former addresses do not match those provided by petitioner;
(2) Mr. Hook's parent's names do not match those provided by petitioner;
(3) Mr. Hook has no siblings;[6]
(4) Mr. Hook reported his passport lost in 2000;
(5) Mr. Hook has only visited the United States once, in 1994, during his army training in Seattle, Washington; and
(6) Mr. Hook has never been to Antigua or Puerto Rico.

*Id.* Further, there is a copy of an IPS document confirming that Mr. Hook was issued a replacement passport in 2000, and that passport number 029518553 was cancelled. *Id.* Finally,

---

[6] Petitioner claims to have two brothers and a sister, who live in Hong Kong, Manchester, and Brussels, respectively. *Hook I.*, doc. 18, p. 15.

there is a copy of Mr. Hook's Driver's License, which was provided in conjunction with an application to renew his passport in 2010. *Id.*

The Hook Identification documents provide more than enough evidence to justify the British Consulate's refusal to accept petitioner's identity. The evidence establishing Mr. Hook's identity necessitated the British Consulate to require much stronger identification from petitioner. To date, petitioner has not provided any such evidence. Petitioner characterizes the British Consulate's refusal as based on mere "suspicion," but it is clear that the evidence weighs heavily against a finding that petitioner is who he claims to be.

### 4. Petitioner has Failed to Cooperate with Removal Efforts

Based on the foregoing and the totality of the record, the undersigned concludes that petitioner has failed to make a good faith attempt to secure travel documents or otherwise cooperate with efforts remove him. Therefore, under 8 U.S.C. § 1231(a)(1)(C), petitioner's continued detention is warranted until begins to cooperate.  Such cooperation will occur when either: (A) petitioner provides information that can conclusively establish that he *is* named Mark David Hook and that he was born in the United Kingdom (which the undersigned considers highly unlikely); or (B) petitioner decides to reveal his true identity and citizenship.  Until such time as he cooperates, he can assert no constitutional challenge to his detention, because his prolonged detention is the result of his own failure to cooperate. *Pelich v. INS*, 329 F.3d 1057, 1060 (9th Cir. 2003); *see also Ayigba v. Young*, 2007 WL 2736678 at *5 (W.D. La. 2007); *Rosario v. Gonzalez*, 2007 WL 1232207 at *5 (W.D. La. 2007); *Amadi v. Young*, 2007 WL 855358 at *3 (W.D. La. 2007).

Furthermore, the undersigned concludes that petitioner has failed to carry his burden of showing that there is no significant likelihood of his removal in the reasonably foreseeable

future. In order carry that burden, petitioner must show that he has made a "full and honest effort to secure travel documents." *Davis*, 482 F. Supp. 2d at 802 (citing *Lema* 341 F.3d at 857). He has not done so, and therefore he has not met his initial burden to state a claim under *Zadvydas*.

As one court has put it, "[t]o the extent that the petitioner may hold, in part, the keys to his jail cell, he cannot complain, when he hides those keys, about his continued detention." *Fahim v. Ashcroft*, 227 F. Supp. 2d 1359, 1366 (N.D. Ga. 2002). Here, if petitioner would cooperate by providing evidence of his identity, "ICE could either begin the process of removing him from the country or release him from custody if necessary." Doc. 71, p. 8. In other words, petitioner herein "holds the keys to his jail cell," and it is up to him to use them.

### B. Petitioner's Procedural Argument Lacks Merit

Petitioner asserts that the delays in effectuating his removal are not attributable to any duplicitous behavior on his part, but rather to ICE's failure to conduct a Post-Order Custody Review (hereafter, "POCR") after 180 days, as required by ICE's own regulations. Doc. 57, pp. 10–17. He also argues that the failure of his deportation officers to interview him face-to-face infringed upon his substantive and procedural due-process rights. *Id.*

The government responds that because petitioner is hampering removal efforts, ICE was not obligated to conduct the POCR. Alternatively, the government argues that it is so obligated, petitioner's application should only be conditionally granted so that ICE may be afforded a reasonable time to conduct the required review. Doc. 71, p. 10.

Petitioner's arguments lack merit. Under the ICE regulations, the initial removal period for an alien subject to a final order of removal is 90 days. 8 C.F.R. § 241.4(g)(1)(i). However, the removal period is extended indefinitely until the alien demonstrates to ICE that he has

complied with his statutory obligations. *See* 8 C.F.R. § 241.4(g)(1)(ii). Thus, "an alien's failure to comply with removal efforts can extend detention indefinitely and remove an alien from the POCR review process." *Bonitto v. Bureau of Immigration and Customs Enforcement*, 547 F. Supp. 2d 747, 752 (S.D. Tx. 2008). "The government must warn such aliens regularly of the consequences of their non-compliance, but if an alien refuses to comply the government is not required to review that alien's continued detention . . . ." *Id.*

As discussed above, it is clear that petitioner is not cooperating with the removal process, insofar as he claims an identity that is difficult (if not impossible) to accept. Accordingly, his initial removal period of 90 days has been appropriately extended and the mandatory POCR process was not implicated. Moreover, petitioner's deportation officers were *not* required to conduct face-to-face interviews with him. Personal interviews are discretionary for the 90-day POCR, [*see* 8 C.F.R. § 241.4(h)(1)], and mandatory for the 180-day POCR, [*see* 8 C.F.R. 241.4(i)(3)(i)], both of which are inapplicable here.

Accordingly, petitioner's detention comports with due process. ICE warned petitioner on numerous occasions regarding the consequences of his failure to supplement his identification. *See* doc. 45, exs. G-14, 26, 27, 29, 30, 32, 34, 39, 41, 42, 46, 48–51, 53, 55–58, 61–63. He has had three deportation officers, all of whom have diligently attempted to remove him from the country. Their inability to do so is not based on their handling of the file, but rather petitioner's lack of cooperation with the removal process.

### IV. CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that petitioner's application for a writ of *habeas corpus*, [doc. 1], be DISMISSED WITHOUT PROJEDUICE

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed. R. Civ. Proc. 72(b), a party

aggrieved by this report and recommendation has 14 days from its service to file specific, written objections with the clerk of court. A party may respond to another party's objections within 14 days after being served with a copy thereof.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this report and recommendation within 14 days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.**

THUS DONE this 18th day of February, 2014.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE

.